1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

JURICA KEZIC, a seaman,

Plaintiff,

v.

THE ALASKA SEA, a vessel, Official No.
559849, her engines, equipment, tackle and
appurtenances, *In Rem*; and ALASKA SEA,
INC., *In Personam,*

Defendants.

NO. C04-820P

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

14

15

16

17

18

19

The trial of this action began on July 26, 2006. The Plaintiff was represented by Eric Dickman of Injury at Sea, Seattle, Washington. The defendant was represented by Robert N. Windes of Moran Windes & Wong, Seattle, Washington. After reviewing and considering the testimony and exhibits submitted at trial and the written and oral arguments of counsel, the Court now makes and enters the following Findings of Fact and Conclusion of Law.

FINDINGS OF FACT

20

21

22

1.    On August 21, 2003, Plaintiff Jurica Kezic was a seaman employed by Defendant Alaska Sea, Inc. as a deckhand aboard the defendant's vessel, the F/V Alaska Sea.

23

2.    The F/V Alaska Sea was engaged in long line fishing for brown crab in Alaskan waters.

24

25

26

**FINDINGS OF FACT &**
**CONCLUSIONS OF LAW - 1**

3.      Plaintiff's job at the time of the incident was to prepare crab pots for launching off the stern of the boat by attaching a short line and C-link to the pots just prior to them being pulled by a long line off the stern.

4.      Crab pots are stacked on deck when not in the water.  Brown crab fishing uses pots that are 5 x 5 x 2.5 feet.   The pots on deck were stacked on top of each other.  The first layer stood vertically on the deck with a second and third layer laying down horizontally.  This made the top of the stack 10 feet from the deck.

5.      The fishing is started by putting out an anchor pot and while the vessel moves each successive pot is attached to the anchored line and pulled off the stern.  At the start of the process, the deck is full of pots, with only a small space for the deckhands to work.

6.      As each pot is pulled off the boat, a second pot is readied in a chute and deckhands look for the next logical pot to pull or winch into place to be attached.

7.      At the time of this incident, a crane operator was using a hydraulic crane to pluck pots off the top of the stack and move them to the deck to be placed into the chute.

8.      Crane operator Bockoven was using controls located on the upper deck area.  He could not see the deck area with the chute and relied upon another deckhand to give him verbal and hand signals.

9.      In the chute at the time of the incident were two pots; one at the very edge of the stern waiting to go off and a second pot lying forward flat on the deck.

10.     The crane operator swung a pot from the stack and suspended it in the air over the chute at approximately a height of 5.5 feet.

11.     The seas were relatively calm with swells under 3 feet.

**FINDINGS OF FACT &**
**CONCLUSIONS OF LAW - 2**

12. The pot in its suspended state rocked back and forth some 4-12 inches and had not yet been stabilized by deckhand Woods.  The crane operator did not have a cleared space in which to set the pot on the deck on the port side of the vessel.

13. Because the vessel is moving, speed in readying the pots is important.  There was no clear line of authority in place as to who controlled which pot would be prepared or moved next and the deckhands were yelling back and forth at each other and to the crane operator.

14. Mr. Kezic was located on the port side of the chute and standing near the most forward pot at the time the suspended pot was overhead.  The space created for the working deckhand to walk is very narrow (31 inches) and abuts the solid wall of the line bin on the port side.

15. Mr. Kezic tripped and struck his head on the suspended pot, causing him to fall near the steps to the catwalk.  There is no reliable evidence that the pot was dropped onto him.

16. He was dazed and almost immediately began yelling in pain.

17. He was removed from the deck and taken to the wheelhouse.

18. The captain examined him, noting a lump on the top of his head about half the size of a man's fist.  Mr. Kezic showed no signs of concussion.

19. Mr. Kezic returned to work within an hour of the incident.

20. Mr. Kezic continued to work the full brown crab season, performing his deckhand duties without any visible signs of injury.

21. Mr. Kezic did complain about his head and neck, but did not request to see a doctor.  Mr. Kezic was regarded by his peers as a complainer and as the crab season wore on they all complained about their aches and pains.

22. Upon reaching Dutch Harbor, Mr. Kezic saw a chiropractor who tested for range of motion and neurological deficits.  Mr. Kezic's exam was normal.

FINDINGS OF FACT &
CONCLUSIONS OF LAW - 3

23. Mr. Kezic lived aboard the vessel for approximately a month, assisting with the storage of gear from the brown crab season and preparation for the red crab season.

24. Mr. Kezic requested to fish the red crab season and signed a contract on October 10, 2003 specifically warranting that he was fit for duty and failing to list any prior injuries.

25. The crew was asked if they wished to take Mr. Kezic on the red crab season and they voted to do so. This indicates that Mr. Kezic was able to fulfill the physical demands of the job.

26. Mr. Kezic successfully completed the red crab season and left the vessel in November, 2003. The captain does not remember complaints of pain by Mr. Kezic during the red crab season.

27. On January 16, 2004, while at his home in Hawaii, Mr. Kezic went to see a doctor for the first time. Dr. Meinke did not find nerve problems and ordered x-ray and CT scans which showed degenerative disc disease. These tests were normal for a man of Plaintiff's age and work history. Dr. Meinke linked the pains complained of to the incident on August 21, 2003 and expected the residual pain reported to resolve with a course of 24 sessions of physical therapy, to be accomplished in two months by March 16, 2004.

28. Mr. Kezic has had various doctors evaluate him since January 2004. His reported pain and symptomology has increased, but there are few if any objective findings that explain or correlate with his symptoms.

29. Dr. Rogers, one of Plaintiff's treating doctors, stands alone in believing that a surgical intervention is needed and the cause of the symptoms is the incident on August 21, 2003.

30. In September of 2005, Plaintiff was evaluated by Dr. Murphy, a neurologist. The evaluation produced the opinions that

    a.    Plaintiff does not need surgery.

    b.    Plaintiff has no neurological impairment.

    c.    Plaintiff should not restrict his activities.

**FINDINGS OF FACT &**
**CONCLUSIONS OF LAW - 4**

1      d.     Plaintiff needs no further treatment.

2    Dr. Murphy concluded that Mr. Kezic's symptoms and the objective tests do not match.

3   31.    Dr. Green, an orthopedist, also evaluated Plaintiff with similar conclusions that Mr. Kezic's

4     complaints do not match the objective evidence, or are exaggerated.  Dr. Green also concludes

5     that there is no evidence to conclude that a single trauma caused the physical changes noted on

6     film.  In other words, no pathology is attributable to the incident of August 21, 2003 and Mr.

7     Kezic does not have pain which has a physical origin.  Dr. Green opined that Mr. Kezic's pain

8     behavior is learned, exaggerated and inconsistent.

9   32.    The Court finds that the opinions of Drs. Green and Murphy establish that Plaintiff's current

10     condition is not related to the August 21, 2003 injury and that Mr. Kezic reached maximum

11     medical cure by March 16, 2004.

12   33.    Plaintiff's earnings records and testimony indicate that it was not his pattern to work in the off

13     season and he relied upon the brown and red crab season for income.  Having reached

14     maximum medical cure in March of 2004, there is no lost income as he would not have

15     intended to work until at least June of 2004.

16   34.    There is no doubt that hitting one's head is painful and that Plaintiff complained about his neck

17     and head after the injury.  He was not, however, limited to the extent that he could not carry

18     out his full job duties or that this pain limited his choices on how and where to spend his time.

19     He asked to stay with the boat and he asked to fish another red crab season.  There is no

20     testimony that he ceased doing any of his daily life activities between August 2003 and March

21     2004.

22   35.    Defendants were ordered to pay maintenance and cure by court order on September 1, 2004

23     (Dkt. No. 21), which they did until September 15, 2005.  The Court finds that maintenance and

24     cure were due from the date of discharge from the vessel until March 16, 2004.

25

26  **FINDINGS OF FACT &**
     **CONCLUSIONS OF LAW - 5**

CONCLUSIONS OF LAW

1.   The Court has jurisdiction under the Constitution of the United States, Article III, Section 2; 28 U.S.C. § 1333; 28 U.S.C. § 1331; and 46 U.S.C. § 688.

2.   Plaintiff has the burden of proof using the "preponderance of the evidence" standard.

3.   Defendant was negligent pursuant to the Jones Act (46 U.S.C. § 688).  Plaintiff was a seaman in the service of the vessel. The crane operator failed to use reasonable care by suspending a swaying crab pot over the work area before a place was open in the chute to place it on the deck.  The crane operator was unable to see that the chute was full and there was no clear line of authority for signaling the readiness of the deck crew.  This severely limited the work area for the crew.  But for the pot's placement, Plaintiff would not have hit his head on the pot when he tripped.

4.   The claim for unseaworthiness fails.  Plaintiff has not proved that any problem with the hydraulics aboard the vessel was the cause of the injury.  This crab pot did not fall upon Plaintiff.  This case was an isolated act of negligence on the part of a crew member.  The vessel was not unseaworthy.

5.   The Court finds that $15,000 for pain and suffering and loss of enjoyment is appropriate in this instance.

6.   The Court finds that Plaintiff had reached maximum medical cure by March 16, 2004 and was fit for duty.  Therefore an award for medical cure is moot.

7.   The Court realizes that medical cure may have been overpaid between September 1, 2004 and September 15, 2005.  These funds presumably have been used to pay medical treatment providers and cannot be recovered.  The record does not include the total amount of maintenance paid.  The overpaid maintenance may be used as a set-off against the $15,000 for pain and suffering and loss of enjoyment of life.

FINDINGS OF FACT &
CONCLUSIONS OF LAW - 6

8.      Judgment for the balance is awarded to Plaintiff along with his taxable costs.

9.      Prejudgment interest is awarded at the federal rate on the Court's award of pain, suffering and loss of enjoyment of life.

10.     The parties are to prepare the judgment for entry within 15 days of this order.


The clerk is directed to provide copies of this order to all counsel of record.

Dated:  August 22, 2006


                                        s/Marsha J. Pechman
                                        Marsha J. Pechman
                                        United States District Judge

**FINDINGS OF FACT &**
**CONCLUSIONS OF LAW - 7**